**The KING SERVICE, INC.,**
**Plaintiff–Appellant,**

v.

**GULF OIL CORPORATION and Gulf Oil Company–U.S., a Division of Gulf Oil Corporation, Defendants–Appellees.**

**No. 344, Docket 87–7533.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1987.

Decided Dec. 2, 1987.

Marc Rowin, New York City (Lynch Rowin Burnbaum & Crystal, P.C., Alphonse M. Alfano, Washington, D.C., Bassman, Mitchell & Alfano, Chartered, of counsel), for plaintiff-appellant.

Randall S. Henderson, Los Angeles, Cal. (Paul, Hastings, Janofsky & Walker, Eileen M. Kelley, Albany, N.Y., Hinman, Straub, Pigors & Manning, P.C., of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, NEWMAN and WINTER, Circuit Judges.

FEINBERG, Chief Judge:

The King Service, Inc. ("King") appeals from a judgment of the United States District Court for the Northern District of New York, Con. G. Cholakis, J., dismissing, on a motion by Gulf Oil Corporation and Gulf Oil Company–U.S., a division of Gulf Oil Corporation (collectively, "Gulf"), for summary judgment, King's claim that Gulf wrongfully terminated King's three-year franchise contract in mid-term in violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 et seq. (the "PMPA"). For the reasons indicated below, we affirm the judgment of the district court.

### Background

In March 1981, King purchased the assets, including 14 service stations, of Mintzer Petroleum Corp., a Gulf gasoline and diesel fuel jobber operating in several counties in upstate New York. The purchase was conditioned upon King's obtaining a franchise contract with Gulf of at least a one-year duration. Concurrently with the closing of the Mintzer sale, King entered into a standard Gulf jobber contract for a three-year term commencing March 15, 1981. King alleges that at the signing of the jobber contract Gulf's representatives told King that Gulf "looked forward to a very long and profitable relationship with King."

In late 1981, however, Gulf suffered financial setbacks as a result of the deregulation of the gasoline industry, and Gulf

determined that a reorganization of its marketing strategy was necessary. As part of its reorganization strategy, on December 1, 1982, Gulf announced that it planned to withdraw from the upstate New York marketing region. On January 10, 1983, Gulf sent King formal notification pursuant to section 102(b)(2)(E) of the PMPA, 15 U.S.C. § 2802(b)(2)(E), that, due to Gulf's intended withdrawal from upstate New York, King's jobber contract would be terminated effective July 15, 1983. Gulf sent similar notifications to other gasoline dealers and jobbers in the region and to the Governor of New York, as required by the PMPA. 15 U.S.C. § 2804(b)(2)(B).

In June 1984, King commenced this action in the Supreme Court of the State of New York; Gulf thereafter removed it to the United States District Court for the Northern District of New York. King's initial complaint set forth a breach of contract claim for premature termination of the jobber contract and a fraud claim alleging that Gulf induced King to enter the jobber contract by false representations that it would fulfill King's gasoline requirements for the length of the contract and for an extensive length of time thereafter. Gulf denied the fraud allegations and asserted an affirmative defense to the contract claim that under section 102(b)(2)(E) of the PMPA a franchisor is entitled to terminate its franchise contracts if the franchisor decides "in good faith and in the normal course of business" to withdraw from a marketing region "based upon the occurrence of changes in relevant facts and circumstances after [the date the franchise was entered into]." In April 1986, Gulf consented to the addition to the case of King's claim under the PMPA.

After discovery was completed, Gulf moved to dismiss the case pursuant to Rule 37 of the Federal Rules of Civil Procedure for King's alleged failure to answer discovery requests and, in the alternative, for summary judgment. Gulf submitted affidavits from several of its executives in support of its claim that, following the execution of the jobber contract with King, Gulf's business became much less profitable due to an unexpectedly large drop in

demand for gasoline, a simultaneous increase in price competition and a sharp increase in refining and marketing costs. According to Gulf, these severe economic reverses prompted Gulf to withdraw from upstate New York and to initiate other measures in an effort to contract its business. In opposition to the motion for summary judgment, King primarily argued that under the PMPA Gulf could not terminate a franchise contract merely because it was uneconomical, claiming that the PMPA only permits non-renewal of a franchise contract under such circumstances. See 15 U.S.C. § 2802(b)(3)(D). King also argued that there was a factual dispute as to (1) whether Gulf's decision to withdraw from upstate New York had been made prior to March 1981, when the franchise contract was entered into, and (2) whether there were any post-contract changes in relevant facts and circumstances since Gulf studies pre-dating the contract showed that the upstate New York region was one of Gulf's least profitable marketing areas.

In a ruling from the bench, Judge Cholakis granted Gulf's motion for summary judgment on King's PMPA claim, based upon a determination that there was no genuine issue as to whether Gulf's decision to withdraw from upstate New York was an "economic decision" and "that the decision was made on circumstances which occurred subsequent to the King contract." In response to King's argument that the PMPA does not permit franchise termination based upon economic considerations, the court stated:

> The Court can think of no more compelling business reason for withdrawing from any market area that would be more cogent or more compelling than failure to produce that degree of profit which the company thought was proper under the circumstances of its operation.

The court granted Gulf summary judgment with respect to the fraud claim, without deciding whether the claim was preempted by the PMPA, concluding that King made no viable showing that Gulf's decision to withdraw from upstate New York had been made at the time the jobber contract was

signed. The court concluded, as was conceded by the parties, that the contract claim was preempted by the PMPA. The court did not rule on Gulf's motion pursuant to Rule 37.

King appeals only from that portion of the order of the district court that granted Gulf summary judgment with respect to King's claim under the PMPA.

## Discussion

King's main argument on appeal concerns the proper construction of section 102(b)(2)(E) of the PMPA. That section provides in relevant part that a franchisor may terminate a franchise based upon:

(E) ... a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination—

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of *changes in relevant facts and circumstances* after such date; ....

15 U.S.C. § 2802(b)(2)(E) (emphasis supplied). The parties agree that King's jobber contract is a "franchise," and King apparently concedes that the upstate New York marketing region is a "relevant geographic market area." The question before us is whether changes in marketing regions other than the region from which the franchisor seeks to withdraw are "changes in relevant facts and circumstances" sufficient to support termination of the franchise under the section.

King argues to us that Gulf could not rely on a national economic decline as a justification for terminating its franchises upon withdrawing from the upstate New York marketing region. King's argument in the district court was somewhat different. It primarily argued there that changes affecting profitability alone were not sufficient to justify franchise termination. Thus, counsel argued that Gulf

"could be losing their shirt; they could be going out of business and the PMPA says they cannot terminate that contract." Gulf claims that we should not entertain the argument King now makes because it is raised for the first time on appeal. However, King did argue in the district court that the "changes" upon which Gulf relied were not "relevant" within the meaning of section 102(b)(2)(E), and Gulf's own counsel stated before the district court that "[t]he position being taken by [King] here is that something had to happen in upstate New York." Thus, while it appears that King has altered the focus of its argument on appeal, its basic challenge to the district court's interpretation of the phrase "relevant facts and circumstances" within the meaning of section 102(b)(2)(E) has not changed.

■ The question of statutory interpretation is apparently one of first impression. To support its interpretation of section 102(b)(2)(E), King looks to the language of the statute and the legislative history. King presents no specific support, however, for the proposition that the phrase "relevant facts and circumstances" means only facts and circumstances arising in the marketing region from which the franchisor seeks to withdraw. King merely argues that unless such an interpretation is adopted franchisees would not have the full measure of protection Congress intended them to have. We disagree.

It is true that Congress enacted the PMPA "to establish 'protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Bellmore v. Mobil Oil Corp.,* 783 F.2d 300, 304 (2d Cir.1986) (quoting S.Rep. No. 731, 95th Cong., 2d Sess. 15 [hereinafter cited as "Senate Report"], reprinted in 1978 U.S.Code Cong. & Ad.News 873, 874). However, Congress also recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." Senate Report at 19, reprinted in 1978 U.S.Code

Cong. & Ad.News 873, 877. As we noted in *Bellmore:*

> The Congress ... recognized 'the legitimate needs of a franchisor to be able to terminate ... or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances.'

783 F.2d at 304 n. 2 (quoting Senate Report at 19, reprinted in 1978 U.S.Code Cong. & Ad.News 873, 877). See also *Russo v. Texaco, Inc.,* 808 F.2d 221, 225 (2d Cir.1986) ("Congress was aware of the need to protect a franchisor's ability to terminate a franchise because of a change in circumstances.").

There are several grounds, in addition to those established in section 102(b)(2)(E), for lawful termination of a franchise relationship under the PMPA. These include: (1) failure by a franchisee to comply with a reasonable and materially significant provision of the franchise; (2) failure by a franchisee "to exert good faith efforts to carry out the provisions of the franchise;" (3) the occurrence of certain events "relevant to the franchise relationship ... as a result of which termination of the franchise ... is reasonable;" and (4) a written agreement between the franchisor and the franchisee. 15 U.S.C. §§ 2802(b)(2)(A)–(D).

Evaluating section 102(b)(2)(E) in light of Congress' express concern for the needs of franchisors to adapt to changing circumstances and in light of the flexibility provided by other provisions of the PMPA, we conclude that the phrase "relevant facts and circumstances" includes national developments and not merely changes confined to the particular region from which the franchisor wishes to withdraw. King's interpretation of the statute assumes that only events occurring within a given geographic market can affect a franchisor's ability to market there. This does not make sense, and we do not believe that Congress had this in mind when it enacted section 102(b)(2)(E).

■ The PMPA is primarily concerned with attempts by franchisors to discriminate against a particular franchisee or to extract an unfair concession based upon the franchisor's superior bargaining power. This concern is not clearly implicated, however, by a franchisor's decision to withdraw from an entire marketing region. Though our reading of section 102(b)(2)(E) does permit a franchisor to terminate its franchises in a given region based upon events occurring outside that region, it does not permit the type of individualized hostile actions the PMPA is designed to prevent. Decisions to withdraw from a marketing region under section 102(b)(2)(E) must still be made "in good faith and in the normal course of business." It was through these tests, and not a narrow construction of the term "relevant," that Congress intended to protect franchisees from arbitrary or discriminatory treatment.

> These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, ... is a wise business decision.

Senate Report at 37, reprinted in 1978 U.S. Code Cong. & Ad.News 873, 896.

■ King also argues that a withdrawal under section 102(b)(2)(E) cannot be based on circumstances that were either known or foreseeable at the time the parties entered into the franchise being terminated. Again, we disagree. The legislative history explicitly indicates that "changes in ... a trend may satisfy [the] statutory requirement" provided "[s]ubsequent events ... alter the trend in such a manner as to serve as the basis for such a determination." Senate Report at 34–35, reprinted in 1978 U.S.Code Cong. & Ad.News 873, 893.

Finally, King argues that summary judgment was inappropriate, even under the statutory interpretation enunciated above, since (1) triable issues of fact exist as to whether Gulf's decision to withdraw from upstate New York pre-dated King's jobber contract; and (2) Gulf failed to describe the adverse developments affecting Gulf's post-March 1981 economic performance with sufficient specificity. To render sum-

mary judgment, a court must determine that there are no unresolved factual disputes as to issues material to the outcome of the litigation. *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In addition, when a motion for summary judgment is supported by affidavits, the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The district court determined here that King failed to come forward with specific facts raising a genuine issue that Gulf's decision to withdraw from upstate New York pre-dated the King franchise. The court also determined that on the record before it there was no genuine issue that Gulf's decision to withdraw from upstate New York was based upon economic developments occurring after the signing of the jobber contract. We see no reason to disturb the district court's determination that summary judgment was appropriate.

We agree with the district court that the PMPA gave Gulf the right, upon the facts as set forth in the record, to terminate King's jobber contract upon Gulf's withdrawal from upstate New York. The judgment of the district court is affirmed.